IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STEVEN SIEGEL, )
          Petitioner, )     Civil Action No. 15-297 Erie
          )
         v. )
          )     Judge Susan Paradise Baxter
NANCY GIROUX, et al., )
         Respondents. )

### MEMORANDUM AND ORDER[1]

    Pending before the Court is a petition for a writ of habeas corpus (ECF No. 1) filed by state prisoner Steven Siegel ("Petitioner") pursuant to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). He is challenging the judgment of sentence imposed upon him in 2012 by the Court of Common Pleas of Erie County. For the reasons that follow, Petitioner's claims for habeas relief are denied, a certificate of appealability is denied on all claims, and his motion (ECF No. 25) to amend his petition to add a new claim is denied.

### I.    Relevant Background

    In the early morning hours of July 18, 2008, a masked assailant robbed Urraro Oil, which is a Marathon gas station located on Sterrettania Road in Erie County, Pennsylvania. This robbery will be referred to as the "July 2008" robbery. The assailant pointed a rifle at the cashier, Bradley Thompson, and demanded money from the register. (Trial Tr., 3/19/12, at 41, 64). Thompson complied and the assailant fled the store. (Id. at 41-43, 49).

---

[1]    On September 14, 2018, the undersigned was sworn in as a United States District Judge. This action was reassigned to this Court's docket on September 17, 2018.

A masked assailant robbed Urraro Oil again a few weeks later. This robbery occurred just after 11:30 p.m. on August 7, 2008, and will be referred to as the "August 2008" robbery. Stephen Zierenberg was the cashier working that night. The assailant shot Zierenberg in the head during the robbery. (Id. at 79). Zierenberg suffered significant injuries but he survived the shooting. Initially, he had no memory of what had occurred during the August 2008 robbery. But as he began to recover from his injuries, his memory of the event returned to him. At Petitioner's trial, Zierenberg testified that he "remember[ed] the complete entire incident[,]" (id. at 81), and explained:

> I never spoke to the police until I arrived back in town after getting back from the recovery facility outside of Pittsburgh. I had no memory when I first regained consciousness at Hamot [which is located in Erie]. I didn't remember the incident at all, had complete memory los[s]. The doctors–they are not even sure if I knew my own name at the time, but I only had a six percent chance to live from the injuries and I survived. And during my recovery time down in Pittsburgh, I woke up one morning and everything was back, I knew what happened, I remembered the whole robbery. And that had caused some issues with some family members because I kept asking them why I was in the hospital, why I was down there [in Pittsburgh], and they would not tell me, just so I could remember on my own[.]

(Id. at 82). Zierenberg gave the police a description of the assailant who committed the August 2008 robbery once he had recovered enough to be interviewed. (Id. at 81-83, 90-91; Trial Tr., 3/20/12, at 81).

The police investigation initially yielded no probable suspects and they did not get a break in the case until late 2010, when Petitioner entered a guilty plea to charges pending against him in an unrelated criminal case. (Trial Tr., 3/20/12, at 42-43). In an effort to get a reduced sentence in that case, Petitioner offered to provide the Commonwealth with information about the crimes committed at Urraro Oil in the summer of 2008. (Id.) State Police Troopers Christopher O'Neill and Mark Van Horn proceeded to interview him on January 7, 2011. During this interview, Petitioner said that his friend, Robert Dimon, committed the August 2008 robbery and that it was Dimon who shot Zierenberg. (Id. at 42-47). The

police interviewed Petitioner again a few months later on March 25, 2011, and he gave the same story in all relevant respects. (Id. at 49-53).

Trooper Brian K. Zeybel interviewed Petitioner for the third time on April 3, 2011. (Id. at 84). In his prior interviews, Petitioner told the police that he had been with Dimon when Dimon allegedly committed the August 2008 robbery, but he maintained that did not know beforehand that Dimon was going to rob the gas station. During his April 3, 2011, interview with Trooper Zeybel, Petitioner changed his story and admitted that he had conspired with Dimon to commit the August 2008 robbery. However, he still insisted that Dimon was the one who shot Zierenberg. (Id. at 87-88).

Petitioner's story changed again a few days later. On April 7, 2011, he sent a letter to Trooper Van Horn. (Id. at 92). He wrote that he was lying when he stated in his prior interviews that he was with Dimon when Dimon robbed the gas station in August 2008. (Id. at 93-94). Petitioner also wrote that he knew the details of that crime only because Dimon told them to him after the fact, and that he (Petitioner) lied in his prior interviews because he thought the police "needed a witness that was there, not just someone saying he [Dimon] told me he did it." (Id. at 94). Petitioner informed Trooper Van Horn that he decided that he "should lie no longer about my involvement just so you could get the bad guy." (Id.)

In the meantime, the police had been searching for Dimon. They located him in June 2011 and he agreed to speak with them. (Id. at 54-55). Dimon admitted that he was the one who carried out the July 2008 robbery and said that on that occasion Petitioner drove the getaway vehicle. (Id. at 56-57). They switched roles for the August 2008 robbery, Dimon told the police. For that robbery, Dimon said, Petitioner was the one who entered the station gas station while he (Dimon) waited in the getaway vehicle.

In June 2011, Petitioner was arrested and charged with numerous crimes for his role in both robberies, including two counts each of robbery and criminal conspiracy to commit robbery, and one count of attempted homicide for shooting Zierenberg. Dimon was also arrested and charged with two counts each of robbery, criminal conspiracy to commit robbery, and related charges.

On October 31, 2011, Dimon pleaded guilty to two counts of robbery for his role in the July 2008 and August 2008 robberies and the remaining counts against him were *nolle prossed*. As discussed in more detail below, his sentencing was postponed so that it would be conducted after Petitioner's trial, which was held on March 19 and 20, 2012. Assistant Public Defender Nicole Sloane, Esq., was Petitioner's trial attorney. Roger Bauer, Esq., the Assistant District Attorney ("ADA"), was the prosecutor. The Honorable Michael E. Dunlavey presided over the trial.

Dimon testified for the Commonwealth and he stated that he carried out the July 2008 robbery and that Petitioner carried out the August 2008 robbery. (Trial Tr., 3/19/12, at 102-11). Dimon said that after Petitioner committed the second robbery and they were fleeing the scene together in the getaway vehicle that Dimon was driving, Petitioner told Dimon that he shot the clerk (Zierenberg). (Id. at 111-12).

The Commonwealth also presented the testimony of the cashiers who had been working at the time of each robbery, Thompson and Zierenberg. Their testimonies corroborated Dimon's because, if credited, they established that different individuals carried out the July 2008 and August 2008 robberies. Thompson testified that the man who committed the July 2008 robbery was a "stockier" built, "larger guy," who stood about 5'9" to 5'10" in height. (Id. at 41). Zierenberg testified that the individual who committed the August 2008 robbery and shot him, was, similar to Petitioner, between 5'6" to 5'8" and "[one] hundred and forty pounds, thin built, dark eyes, and just very tiny." (Id. at 78; see id. at 81 (the robber had a "light build, very thin, wasn't bulky or built[.]")). Zierenberg also testified that Petitioner,

4

not Dimon, "fit the description of the person" who shot him. (Id. at 83). The description of the shooter that Zierenberg gave at the trial was consistent with the one he had given to the police in 2008 after he had recovered enough from his injuries to be interviewed by them. (Id. at 82-83, 90-91; Trial Tr., 3/20/12, at 81).

At the conclusion of Petitioner's trial, the jury found him guilty of committing the crimes charged for the August 2008 robbery. Specifically, it convicted him of attempted homicide, robbery, aggravated assault, criminal conspiracy to commit robbery, recklessly endangering another person, possession of instruments of a crime, terroristic threats, theft by unlawful taking or disposition, and receiving stolen property. The jury found him not guilty for the crimes charged for the July 2008 robbery. On May 1, 2012, Judge Dunlavey sentenced him to an aggregate term of 23-50 years of imprisonment.

Tina Fryling, Esq., represented Petitioner in his direct appeal to the Superior Court of Pennsylvania. On September 19, 2012, Judge Dunlavey issued a Rule 1925(a) opinion. (ECF No. 18-2 at 38-51). On March 22, 2013, the Superior Court affirmed Petitioner's judgment of sentence in Commonwealth v. Siegel, No. 969 WDA 2012, slip op. (Pa. Super. Ct. Mar. 22, 2013) ("Siegel I"). (ECF No. 18-7 at 1-18). He did not file a petition for allowance of appeal ("PAA") with the Pennsylvania Supreme Court. Accordingly, his judgment of sentence became final under both state and federal law on April 22, 2013, when the time for him to file a PAA expired. 42 PA. CONS. STAT. § 9545(b)(3) ("a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review."); Gonzalez v. Thaler, 565 U.S. 134, 149-54 (2012) (a judgment becomes final under 28 U.S.C. § 2244(d)(1)(A) at the conclusion of direct review or the expiration of time for seeking such review).

On or around December 20, 2013, Petitioner filed his first and only timely-filed petition for collateral relief pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 PA.CONS.STAT. § 9541 *et seq.* (SCR No. 22). By this time, Judge Dunlavey had taken senior status and the Honorable Ernest J. DiSantis was assigned to preside over the PCRA case. Judge DiSantis appointed Christine Fuhrman Konzel, Esq. to represent Petitioner. Judge DiSantis subsequently denied Petitioner's request for PCRA relief. (ECF No. 18-2 at 25-37). On July 17, 2015, the Superior Court issued Commonwealth v. Siegel, No. 1418 WDA 2014, slip op. (Pa. Super. Ct. July 17, 2015) ("Siegel II"), in which it affirmed the decision to deny PCRA relief. (ECF No. 18-8 at 1-10). It denied his application for permission to appeal *nunc pro tunc* on October 5, 2015.

On or around October 26, 2015, Petitioner filed a second PCRA petition. (SCR No. 30). Less than two months later, on December 7, 2015, he commenced this action and filed a petition for a writ of habeas corpus with this Court. (ECF No. 1).[2] He raised four claims in the petition: one due process claim in which he asserted that the Commonwealth supressed favorable evidence and presented false

---

[2]     AEDPA requires, with a few exceptions not applicable here, that federal habeas claims must be filed with the district court within one year of the date the petitioner's judgment of sentence became final. 28 U.S.C. § 2244(d)(1)(A). The statute also provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). Petitioner's judgment of sentence became final on April 22, 2013, and AEDPA's limitations period ran from that date until December 20, 2013, when he filed his first PCRA petition. At that point, approximately 242 days had expired from AEDPA's statute of limitations. That limitations period was statutorily tolled during the duration of the first PCRA proceeding in accordance with § 2244(d)(2). Once Petitioner's first PCRA proceeding concluded, he had approximately 123 more days remaining on AEDPA's limitations period in which to file a timely application for federal habeas relief with this Court. If the Court assumes without deciding that Petitioner's first PCRA proceeding was pending until on or around November 5, 2015 (30 days after the date the Superior Court denied his application for permission to file an appeal *nunc pro tunc*), Petitioner had until on or around March 7, 2016, to file timely habeas claims with this Court.

An untimely PCRA petition does not statutorily toll AEDPA's statute of limitations under § 2244(d)(2), Pace v. DiGuglielmo, 544 U.S. 408, 414, 417 (2005), and that is why Petitioner wisely filed a "protective" habeas petition with this Court on December 7, 2015, while he was at the same time litigating his second PCRA petition. Rhines v. Weber, 544 U.S. 269 (2005) (in order to avoid predicaments that may arise in attempting to comply with AEDPA's statute of limitations while at the same time exhausting claims in state court, a state prisoner may file a "protective" habeas petition in federal court and ask the district court to stay the federal habeas proceeding until state remedies are exhausted). By proceeding that way, he ensured that the claims he raised in his petition were timely filed.

testimony in violation of its obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and three claims in which he asserted that his trial attorney provided him with ineffective assistance.

This federal habeas case was stayed while Petitioner litigated his second PCRA petition. (ECF No. 3). The Honorable William J. Cunningham presided over Petitioner's second PCRA proceeding and he dismissed the state petition because he found that it was untimely under the applicable state-law statute of limitations. (ECF No. 18-3 at 20-29). The Superior Court affirmed that decision in <u>Commonwealth v. Siegel</u>, No. 273 WDA 2016, slip op. (Pa. Super. Ct. Aug. 16, 2016) ("<u>Siegel III</u>"). (ECF No. 18-9 at 1-4).

After Petitioner's second PCRA proceeding concluded, this Court lifted the stay in this case, Respondent filed an answer to the habeas petition (ECF No. 18), and Petitioner filed a reply (ECF No. 22). Respondent also filed with this Court hard copies of the state court records. (ECF No. 19). Thereafter, in March 2018, this Court directed Respondents to supplement the record to include the transcripts from Dimon's plea and sentencing hearings, which were required in order to evaluate Petitioner's <u>Brady</u> claims.[3] After Respondents produced those transcripts (ECF No. 24), Petitioner filed a "motion for leave to supplement habeas corpus petition." (ECF No. 25). The Court has considered that document as a supplemental reply.[4]

## II.     Jurisdiction and Standard of Review.

This Court has jurisdiction under 28 U.S.C. § 2254, which is the federal habeas statute applicable to state prisoners. It permits a federal court to grant a state prisoner the writ of habeas corpus "on the

---

[3]     Rule 7 of the Rules Governing Section 2254 Cases In The United States District Courts permits a district court to "direct the parties to expand the record by submitting additional materials related to the petition."

[4]     Petitioner also sought in his motion leave to amend his petition to raise an additional ground for habeas relief. That request is denied for the reasons set forth below.

ground that he or she is in custody in violation of the Constitution…of the United States." 28 U.S.C. § 2254(a). It is Petitioner's burden to prove that he is entitled to the writ. Id.; see, e.g., Vickers v. Superintendent Graterford SCI, 858 F.3d 841, 848-49 (3d Cir. 2017). There are other prerequisites that he must satisfy before he can receive habeas relief (most relevant here is the burden imposed upon him by the standard of review set forth at 28 U.S.C. § 2254(d) (which is discussed below and which applies to at least two of his claims)), but, ultimately, Petitioner cannot receive federal habeas relief unless he demonstrates that he is in custody in violation of the federal constitution. 28 U.S.C. § 2254(a); see, e.g., Vickers, 858 F.3d at 849.

In 1996, Congress made a number of significant amendments to the federal habeas statutes with the enactment of AEDPA, which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002) (citing Williams v. Taylor, 529 U.S. 362, 403-04 (2000)). AEDPA reflects the view that habeas corpus is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment)).

### A. Deference to a State Court's Findings of Fact Under 28 U.S.C. § 2254(e)(1)

A finding of fact made by a state court has always been afforded considerable deference in a federal habeas proceeding. AEDPA continued that deference and mandates that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). Petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence." Id.

### B. Standard of Review When the State Court Adjudicates a Claim On the Merits

AEDPA also put into place a new standard of review, which is codified at 28 U.S.C. § 2254(d). It applies "to any claim that was adjudicated on the merits" by the state court, § 2254(d), and it prohibits a federal habeas court from granting relief unless the petitioner established that the state court's "adjudication of the claim":

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). For the purposes of § 2254(d), a claim has been "adjudicated on the merits in State court proceedings" when a state court (here, the Superior Court)[5] made a decision that finally resolves the claim based on its substance, not on a procedural, or other, ground. See, e.g., Richter, 562 U.S. at 98-100; Robinson v. Beard, 762 F.3d 316, 324 (3d Cir. 2014).

If, when reviewing a particular claim, this Court determines that Petitioner has overcome the burdens imposed upon him be § 2254(d)'s standard of review, this Court must then proceed to review the merits of the claim *de novo* to evaluate if a constitutional violation occurred. Vickers, 858 F.3d at 849 (citing Lafler v. Cooper, 566 U.S. 156, 174 (2012)).[6] That is because "a federal court can only grant the Great Writ if it is 'firmly convinced that a federal constitutional right has been violated[.]'" Id. (citing Williams, 529 U.S. at 389, and Horn v. Banks, 536 U.S. 266, 272 (2001)).

**1.     Application of § 2254(d)(1)**

---

[5]     When applying § 2254(d), the Court considers the "last reasoned decision" of the state courts. Simmons v. Beard, 590 F.3d 223, 231-32 (3d Cir. 2009) (quoting Bond v. Beard, 539 F.3d 256, 289-90 (3d Cir. 2008)); Brown v. Superintendent Greene SCI, 834 F.3d 506, 512 (3d Cir. 2016).

[6]     As the United States Court of Appeals for the Third Circuit explained in Vickers, these steps "sometimes merge in cases in which the federal habeas court determines that the state court engaged in an 'unreasonable application' of clearly established Supreme Court precedent because it will be apparent from the explication of why the state court unreasonably applied that precedent that, under any reasonable application, a constitutional violation did occur." 858 F.3d at 849 n.8.

The standard of review set forth at § 2254(d)(1) applies to questions of law and mixed questions of law and fact. In applying it, this Court's first task is to ascertain what law falls within the scope of the "clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1). Importantly, "'clearly established federal law' means 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'" Dennis v. Sec'y, Pennsylvania Dep't of Corr., 834 F.3d 263, 280 (2016) (en banc) (quoting Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003)). It "includes only 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'" White v. Woodall, 572 U.S. 415, 419 (2014) (quoting Howes v. Fields, 565 U.S. 499, 505 (2012), which quoted Williams, 529 U.S. at 412).[7]

Once the "clearly established Federal law, as determined by the Supreme Court of the United States" is ascertained, this Court must determine whether the Superior Court's adjudication of the claim at issue was "contrary to" that law. Williams, 529 U.S. at 404-05 (§ 2254(d)(1)'s "contrary to" and "unreasonable application of" clauses have independent meaning). A state-court adjudication is "contrary to…clearly established Federal law, as determined by the Supreme Court of the United States[,]" § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," Williams, 529 U.S. at 405, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent," id. at 406. A "run-of-the-mill" state-court decision applying

---

[7]     The Supreme Court "has repeatedly emphasized" that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court'" under § 2254(d)(1). Glebe v. Frost, 135 S.Ct. 429, 431 (2014) (per curiam) (citing Lopez v. Smith, 135 S.Ct. 1, 4-5 (2014) (per curiam). See, e.g. Renico v. Lett, 559 U.S. 766, 779 (2010) (state court's failure to apply decision by federal circuit court "cannot independently authorize habeas relief under AEDPA.") Thus, this Court is restricted under § 2254(d)(1) to evaluate the state court's decision in light of United States Supreme Court precedent. Additionally, "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced.'" Lopez, 135 S.Ct. at 4 (quoting Marshall v. Rodgers, 133 S.Ct. 1446, 1451 (2013) (per curiam)).

the correct legal rule from Supreme Court decisions to the facts of a particular case does not fit within § 2254(d)(1)'s "contrary to" clause and will be reviewed under the "unreasonable application" clause. Id.

If the state court's adjudication survives review under § 2254(d)(1)'s "contrary to" clause, then the Court must next analyze the claim at issue under its "unreasonable application of" clause. "A state court decision is an 'unreasonable application of federal law' if the state court 'identifies the correct governing legal principle,' but 'unreasonably applies that principle to the facts of the prisoner's case.'" Dennis, 834 F.3d at 281 (quoting Williams, 529 U.S. at 413). To satisfy his burden here, Petitioner must do more than convince this court that the state court's decision was incorrect. Id. He must show that it "'was *objectively* unreasonable.'" Id. (quoting Williams, 529 U.S. at 409) (emphasis added by court of appeals). Importantly, this means that Petitioner must demonstrate that the state court's decision "*was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement*." Richter, 562 U.S. at 103 (emphasis added).

> It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. See Lockyer, supra, at 75, 123 S.Ct. 1166.
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. Cf. Felker v. Turpin, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further.

Id. at 102.


## 2. Application of § 2254(d)(2)

The standard of review set forth at § 2254(d)(2) applies when Petitioner "challenges the factual basis for" the Superior Court's "decision rejecting a claim," Burt v. Titlow, 571 U.S. 12, 18 (2013). "[A] state court decision is based on an 'unreasonable determination of the facts' if the state court's factual

findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings." Dennis, 834 F.3d at 281 (quoting § 2254(d)(2) and citing Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)).

"'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" Titlow, 571 U.S. at 18 (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)); see Rice v. Collins, 546 U.S. 333, 342 (2006) (reversing court of appeals's decision because "[t]he panel majority's attempt to use a set of debatable inferences to set aside the conclusion reached by the state court does not satisfy AEDPA's requirements for granting a writ of habeas corpus."). Thus, "if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede'" the state court's adjudication. Wood, 558 U.S at 301 (quoting Collins, 546 U.S. at 341-42). "[H]owever, '[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" Brumfield v. Cain, 135 S.Ct. 2269, 2277 (2015) (quoting Miller-El, 537 U.S. at 340); see Dennis, 834 F.3d at 281.[8]

## III. Discussion

### A. Claim 1: The Brady Claims

---

[8] Since AEDPA's enactment, federal courts have debated how to harmonize §§ 2254(d)(2) and (e)(1). They "express the same fundamental principle of deference to state court findings[,]" and federal habeas courts "have tended to lump the two provisions together as generally indicative of the deference AEDPA requires of state court factual determinations." Lambert v. Blackwell, 387 F.3d 210, 235 (3d Cir. 2004). While § 2254(d)(2) only applies when a claim was "adjudicated on the merits in State court proceedings," § 2254(e)(1) does not contain that qualifying language. Section 2254(e)(1) applies in all habeas cases brought under § 2254. Lambert, 387 F.3d at 235.

In Claim 1, Petitioner contends that the Commonwealth violated his due process rights because it suppressed "a deal between the prosecution and Robert Dimon to testify" and it presented false testimony from Dimon. (ECF No. 1 at 7). To support these allegations, Petitioner relies upon a statement made by Judge Dunlavey in his September 19, 2012, Rule 1925(a) opinion. (ECF No. 18-2 at 38-51). In it, the judge wrote, when he was discussing the background of Petitioner's case, that "Dimon entered into a plea agreement whereby he would testify at [Petitioner's] trial in exchange for a guilty plea to two counts of Robbery, with all remaining counts being nolle prossed." (Id. at 39).

### 1. Relevant Background

Petitioner raised Claim 1 in his first PCRA proceeding. The Superior Court denied it in Siegel II, concluding that it was an "after-discovered evidence claim" because the "'evidence' forming the basis of" it was the statement Judge Dunlavey made in his Rule 1925(a) opinion, which first became available to Petitioner during his direct appeal. (ECF No. 18-8 at 9-10). According to the Superior Court, after Judge Dunlavey issued that opinion, Petitioner should have requested a remand so that the "newly-discovered evidence" claim was decided in the first instance by the trial court. (Id.) Petitioner did not follow that course and, as a result, the Superior Court held he waived his Brady claims "for purposes of PCRA review." (Id.)

Petitioner raised his Brady claims again in his second PCRA proceeding, this time as a component of "layered" ineffective assistance of counsel claims.[9] Judge Cunningham denied Petitioner's second PCRA petition because it was untimely, but he also provided an alternative holding in which he denied the relevant claims on the merits. (ECF No. 18-3 at 22, 25-27). Judge Cunningham recognized

---

[9]     Specifically, Petitioner claimed that his direct appeal counsel, Attorney Fryling, was ineffective for waiving the Brady claims, and that the attorney who represented him in the first PCRA proceeding, Attorney Konzel, was ineffective for failing to litigate that specific claim of Fryling's ineffectiveness.

that if, as Petitioner had claimed, there was an undisclosed agreement between the Commonwealth and

Dimon, a new trial might be warranted. (Id. at 25). He held, however, that "*there is no evidence that*

*there was an agreement between Dimon and the Commonwealth.*" (Id.) (emphasis added). He explained:

> [Petitioner's] sole basis for asserting an undisclosed agreement existed is a
> reference in the Court's September 1[9], 2012 Memorandum Opinion, which stated
> "Robert Dimon entered into a plea agreement whereby he would testify at [Petitioner's]
> trial in exchange for a guilty plea to two counts of Robbery, with all remaining counts
> being *nolle prossed*," citing the guilty pleas [Dimon entered into for both robbery
> cases]…. *[U]pon review of Dimon's plea transcript, there is no evidence to suggest the*
> *plea was predicated on an agreement to testify.* In discussing the plea, the
> Commonwealth made clear that in return for entering the plea, the Commonwealth would
> only *nolle prosequi* the remaining counts. Plea Transcript of Robert Dimon, October 31,
> 2011, p. 9. Dimon agreed that was his understanding of the plea agreement. *Plea*
> *Transcript of Robert Dimon, October 31, 2011, p. 9.*

(Id. at 27) (emphasis added).

In Siegel III, the Superior Court affirmed the decision to deny PCRA relief. It held that the

second PCRA petition was untimely under the state-law statute of limitations and, therefore, it lacked

jurisdiction to consider Petitioner's claims. (ECF No. 18-9 at 2-4).

### 2. Legal Analysis

Because the Superior Court held in Siegel II that Petitioner waived his Brady claims, and denied

his second PCRA petition in Siegel III as untimely, it may be that this Court could deny Petitioner's

Brady claims as procedurally defaulted.[10] This Court need not resolve the more complex issue of

procedural default, however, if it determines that Petitioner's Brady claims have no merit even under a

---

[10]      The doctrine of procedural default is "grounded in concerns of comity and federalism," Coleman v. Thompson, 501
U.S. 722, 730 (1991), and, in simple terms, it provides that a petitioner defaults a federal habeas claim if he: (a) failed to
present it to the state court and the state court would now decline to address it on the merits because state procedural rules bar
such consideration; or (b) failed to comply with a state procedural rule when he presented the claim to the state court, and for
that reason the state court declined to address the federal claim on the merits. See, e.g., Edwards v. Carpenter, 529 U.S. 446,
451 (2000); O'Sullivan v. Boerckel, 526 U.S. 838, 851-56 (1999) (Stevens, J. dissenting) (describing the history of the
procedural default doctrine); Wainwright v. Sykes, 433 U.S. 72 (1977); Lines v. Larkins, 208 F.3d 153, 162-69 (3d Cir.
2000).

*de novo* review and can more efficiently dispose of it for that reason. Lambrex v. Singletary, 520 U.S. 518, 525 (1997) (where analysis of procedural default is complex, the court may skip the issue and proceed to the merits). That course is followed here.

A Brady violation occurs when the government: (1) knowingly presents or fails to correct false testimony; (2) fails to provide requested exculpatory evidence; or, (3) fails to volunteer exculpatory evidence never requested. Haskell v. Superintendent Greene SCI, 866 F.3d 139, 149 (3d Cir. 2017) (citing United States v. Agurs, 427 U.S. 97 (1976), holding modified by Unites States v. Bagley, 473 U.S. 667 (1985)).

To prove his suppressed-evidence Brady claim, Petitioner must demonstrate that: (1) the evidence at issue was favorable to the defense, either because it was exculpatory or because it was impeaching; (2) the Commonwealth suppressed the evidence; and (3) the evidence was material, meaning that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Strickler v. Greene, 527 U.S. 263, 281-82 (1999); Dennis, 834 F.3d at 309. If the Commonwealth had any agreement with Dimon that would have induced him to testify favorably for it at Petitioner's trial, the Commonwealth had an obligation to disclose that information because it would have been impeachment evidence favorable to the defense. See, e.g., Giglio v. United States, 405 U.S. 150, 154 (1972); United States v. Bagley, 473 U.S. 667, 676 (1985).

To prevail on the related false-testimony Brady claim, Petitioner must demonstrate that: (1) Dimon committed perjury; (2) the Commonwealth knew or should have known that Dimon's testimony was false and did not correct it; and (3) "'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" Haskell, 866 F.3d at 146 (quoting Agurs, 427 U.S. at 103); Giglio, 405 U.S. at 154; Napue v. Illinois, 360 U.S. 264, 271 (1959).

As set forth above, Judge Cunningham found as fact during the second PCRA proceeding that there was no agreement between Dimon and the Commonwealth that had not been disclosed to the defense. Petitioner has not directed this Court to the required "clear and convincing" evidence to overcome the presumption of correctness that this Court must afford to that finding of fact under § 2254(e)(1). For this reason alone, Petitioner's <u>Brady</u> claims fail. However, even if this Court afforded no deference to Judge Cunningham's finding of fact, it would still deny Petitioner's <u>Brady</u> claims because an independent review of the relevant transcripts from Dimon's plea and sentencing hearings establish they have no merit.

The transcript of Dimon's October 31, 2011, plea hearing (ECF No. 24 at 1-11) shows that on that date he pleaded guilty to two counts of robbery for his role in the July and August 2008 crimes and that the remaining counts against him were *nolle prossed*. There was no discussion at that hearing about Dimon testifying against Petitioner or receiving consideration in exchange for his testimony against Petitioner. At the end of the hearing, the trial court (the Honorable Judge Shad Connelly) accepted Dimon's pleas and ordered that a presentence report be prepared. (ECF No. 24 at 11).

Dimon's original sentencing hearing was held on January 10, 2012, before Judge Dunlavey. Early in the hearing, Dennis Williams, Esq., who was representing Dimon at the time, stated that his client "is more than willing to testify at [Petitioner's] trial," which was scheduled to be held approximately two months later during the March 2012 trial term. (ECF No. 24-2 at 8). Attorney Williams said: "I apologized to [ADA Bauer] because apparently I hadn't communicated this information to him earlier[.]" (<u>Id.</u>) The following exchange then occurred:

Mr. Williams: So [Dimon's] prepared to testify so [sic] the Commonwealth–

The Court:    Do you want to wait then on the sentencing until he testifies?

| Mr. Bauer: | Well, Judge, I'll be blunt. Everybody's here today. And don't get me wrong– |
| The Court: | I know everybody's here, but it's up to you because, you know, this is–that second [August 2008] shooting, that second robbery, it's a pretty horrific set of circumstances. If he's willing to cooperate and testify, I'd be willing to take that into consideration. |
| Mr. Bauer: | I don't dispute that, but obviously, Judge, and just so the record's clear on this, I did make [an] attempt to contact Mr. Williams prior to everything going down here. That–they didn't–apparently there was some problem, he didn't get my messages. I assumed they did not wish to have any discussions with the Commonwealth. And so this was kind of a surprise today when he brought that to my attention. |
| | --- |
| | … to be perfectly blunt about it, because Mr. Williams dropped this on me, this is something that I would need to discuss with other people, like families, because I'm not inclined to change the actual plea itself. |
| The Court: | It's not changing the plea. |
| | --- |
| Mr. Williams: | And I'm not asking to change the plea. I would simply ask the Court to give him the opportunity and for the Court to consider the circumstances as they would develop for the purposes of sentencing…. |

(Id. at 9-11).

ADA Bauer then asked the court to continue Dimon's sentencing "so I can discuss the matter with the families in depth to make sure we're all on the same page, because I certainly do not want to jeopardize anything as far as the prosecution of [Petitioner,] actual shooter of Mr. Zierenberg." (Id. at 12). Judge Dunlavey agreed to continue the sentencing hearing. (Id. at 13). ADA Bauer stated: "I'm not saying…anything's going to happen, but I do want to have the time. If he's willing to do stuff, I need to discuss this in depth with everybody…. I don't want to–don't want to short shrift my victims." (Id. at 13-14).

A little more than two months later, in March 2012, Dimon testified for the prosecution at Petitioner's trial. During his direct examination, he acknowledged that he was charged with two counts

17

of first-degree robbery for his role in the crimes committed at Urraro Oil in July and August 2008 and he explained that he pleaded guilty to those crimes. (Trial Tr., 3/19/12, at 116). ADA Bauer asked Dimon: "did I give you any special deal or promises in exchange for your testimony?" (<u>Id.</u>) Dimon replied: "No." (<u>Id.</u>)

During cross-examination by Petitioner's counsel, Attorney Sloane, Dimon expanded on his testimony. He said that he was charged with multiple crimes for his role in each robbery but that pursuant to his plea agreement with the Commonwealth, he pleaded guilty to two counts of robbery and the remaining charges were *nolle prossed*. (Trial Tr., 3/20/12, at 16-17). The following exchange with Attorney Sloane then occurred:

> Q. And would you agree with me that that's substantial consideration for your testimony here today?
>
> A. I don't believe that was in consideration of my testimony, ma'am.
>
> Q. They just gave you that break just to give you that break?
>
> A. That plea was before I'd agreed to testify, ma'am.
>
> Q. Okay. So what about your sentencing. [You were] originally scheduled for sentencing in January 2012, correct?
>
> A. Yes.
>
> Q. *But your sentencing was moved to April of 2012?*
>
> A. *I believe so; I'm not sure of the date.*
>
> Q. *Can you explain to the jury why that is?*
>
> A. *Because the judge and district attorney had discussed the possibility of waiting on this trial, ma'am.*
>
> Q. *To see how well you testified, correct?*
>
> A. *I believe so, yes, ma'am.*
>
> Q. *In the prosecution of my client?*

> A.    Yes.

(Id. at 17-18 (emphasis added)). On redirect examination, the ADA Bauer asked Dimon: "with regards to what they called your consideration, you had indicated that there wasn't any discussions about cooperating [until] after you entered your pleas, is that correct?" (Id. at 31). Dimon replied: "Yes." (Id.)

Dimon sentencing hearing was held on April 4, 2012. (ECF No. 24-1 at 1-27). Judge Dunlavey presided over this hearing and during it, Dimon's newly-appointed attorney, Wayne G. Johnson, Jr., Esq., asked the judge to take into consideration that Dimon had accepted responsibility for his actions and had "decided on his own to cooperate." (Id. at 6). ADA Bauer responded that Dimon "cooperat[ed] to the satisfaction of the Commonwealth. I mean, he testified truthfully." (Id. at 9). He further stated that:

> …[Dimon] was not lying and did cooperate fully and he lived up to his end of the bargain, so to speak, that we had here back in January.
>
> Though it wasn't a formal plea, he indicated his willingness to cooperate at the time of the original sentence, and we continued this until [Petitioner's] trial was done. And obviously, though, there was no overt promise made. He may expect some consideration; there was never anything given to him in consideration, and he still continued to cooperate. So I guess I can take his sorrow or remorse at his word that he is sincere about it.

(Id.)

Judge Dunlavey stated that one of the factors that he was taking into consideration when sentencing Dimon was the assistance his testimony provided to the Commonwealth at Petitioner's trial. (Id. at 23-24). He sentenced Dimon to 60-120 months of incarceration for the July 2008 robbery to be followed by a consecutive sentence of 36-72 months of imprisonment for the August 2008 robbery. (Id. at 23).

The transcripts of Dimon's plea and sentencing hearings do not support Petitioner's allegation that the Commonwealth withheld evidence of any agreement, express or tacit, that it had with Dimon in

exchange for his trial testimony, or that any part of Dimon's trial testimony was false. As set forth above, the sole evidence that Petitioner relies upon to support his <u>Brady</u> claims is the statement that Judge Dunlavey made in his September 19, 2012, Rule 1925(a) opinion that "Dimon entered into a plea agreement whereby he would testify at [Petitioner's] trial in exchange for a guilty plea to two counts of Robbery, with all remaining counts being nolle prossed." (ECF No. 18-2 at 39). A review of the relevant transcripts demonstrate that Judge Dunlavey simply made a misstatement. The transcripts establish that the only agreement that Dimon had with the Commonwealth when he entered is guilty pleas in October 2011 was that, in exchange for his pleas, it would *nolle pros* the other counts he faced. It was not until Dimon's January 10, 2012, sentencing hearing that he entered into a discussion with the Commonwealth about the possibility of receiving consideration in exchange for testifying against Petitioner. Importantly, during Dimon's trial testimony the jury heard that information because Dimon acknowledged that his sentencing hearing had been postponed so that the judge and ADA Bauer could "see how well he testified" at Petitioner's trial. (Trial Tr., 3/20/12, at 18). The jurors were thus apprised of the inducement Dimon had to testify favorably for the Commonwealth and were able to take that information into consideration when they evaluated his credibility.

Based upon all of the foregoing, this Court concludes that neither Petitioner's suppressed-evidence <u>Brady</u> claim nor his false-testimony <u>Brady</u> claim has merit. Therefore, Claim 1 is denied.

### B.    Ineffective Assistance of Counsel Claims

In Petitioner's remaining three grounds for relief, he contends that Attorney Sloane provided him with ineffective assistance in violation of his Sixth Amendment rights. He argues that she should have objected when the prosecution recalled Zierenberg on the second day of trial (Claim 2), and also that she

should have objected to the term of the sentence imposed (Claim 3). Petitioner also faults her for failing to introduce a recording of Zierenberg's October 9, 2008, statement (Claim 4).

The Superior Court adjudicated Claims 2 and 3 in <u>Siegel II</u>. Therefore, AEDPA's standard of review at § 2254(d) applies to this Court's review of those two grounds for relief. The Superior Court did not rule upon Claim 4 because Petitioner did not raise it to the Superior Court, and the consequence of his failure to do so is discussed below.

All of Petitioner's ineffective assistance claims are governed by the standard set forth by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). <u>Strickland</u> also represents the "clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1), in which to analyze Claims 2 and 3 under AEDPA's standard of review. In <u>Strickland</u>, the Supreme Court recognized that the Sixth Amendment's guarantee that in all criminal prosecutions, the accused has the right to be represented by an attorney who meets at least a minimal standard of competence. 466 U.S. at 685-87. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance[.]" <u>Titlow</u>, 571 U.S. at 24.

Under <u>Strickland</u>, it is Petitioner's burden to establish that his "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." <u>Id.</u> at 687. The Supreme Court has emphasized that "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[.]'" <u>Titlow</u>, 571 U.S. at 22 (quoting <u>Strickland</u>, 466 U.S. at 690). As the Supreme Court observed in <u>Strickland</u>:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved

> unsuccessful, to conclude that a particular act or omission of counsel's was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

466 U.S. at 689 (internal citations and quotations omitted); Richter, 562 U.S. at 104 ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (quoting Strickland, 466 U.S. at 689).

Strickland also requires that Petitioner demonstrate that he was prejudiced by his trial counsel's deficient performance. This places the burden on him to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

> [Petitioner] "need not show that counsel's deficient performance 'more likely than not altered the outcome of the case'–rather, he must show only 'a probability sufficient to undermine confidence in the outcome.'" Jacobs v. Horn, 395 F.3d 92, 105 (3d Cir. 2005) (quoting Strickland, 466 U.S. at 693-94). On the other hand, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." [Richter, 562 U.S. at 104] (citing Strickland, 466 U.S. at 693). Counsel's errors must be "so serious as to deprive the defendant of a fair trial." Id. (citing Strickland, 466 U.S. at 687). The likelihood of a different result must be substantial, not just conceivable. Id.

Brown v. Wenerowicz, 663 F.3d 619, 630 (3d Cir. 2011).

Because a petitioner cannot prevail on a Sixth Amendment claim unless he establishes both prongs of the Strickland test, the Supreme Court permits courts to address only the prejudice prong if it is more efficient to proceed in that manner. 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). See also Weaver v. Massachusetts, 137 S. Ct. 1899, 1910-11 (2017)

("As a rule…a violation of the Sixth Amendment right to effective representation is not complete until the defendant is prejudiced.") (internal quotations and citations omitted).

       1.        **Claim 2: Failure to Object to Zierenberg's In-Court Identification**

       **(a)**        **Relevant Background**

Thompson was the Commonwealth's first witness. There is no evidence that Zierenberg was in the courtroom to hear his testimony. The prosecution called Zierenberg as its fourth witness, and it appears that he remained in the courtroom after he testified and, therefore, would have heard part of Dimon's testimony, who testified after him. Zierenberg also was apparently in the courtroom for some or all of the second day of the trial. Trooper O'Neill testified that day, and during his testimony the prosecution played an audio recording of one of Petitioner's interviews with the police, which Zierenberg heard. (Trial Tr., 3/20/12 at 52-54). During a break, Zierenberg approached the prosecutor and told him that he recognized Petitioner's voice (which he had not heard before) as being the voice of the man who had shot him. (Id. at 99). The prosecution then recalled Zierenberg as its final witness and he testified that he heard the shooter speak multiple times during the August 2008 robbery and that, and upon hearing Petitioner's voice in the recorded statement, he "immediately recognized" that it was the voice of the man who had shot him. (Id. at 100).

In Claim 2, Petitioner contends that Attorney Sloane should have objected to Zierenberg's in-court identification on the grounds that it was tainted because Zierenberg remained in courtroom after he testified and heard the testimony of the witnesses who were called after him.[11] (ECF No. 1 at 9).

---

[11]        When he litigated this claim before the Superior Court, Petitioner admitted that "there was no order issued for sequestration of the witnesses in the trial record[,]" but asserted that "it is the common practice in Erie County, especially during a jury trial, for the witnesses (on both sides) to be sequestered." (ECF No. 18-2 at 15). The Superior Court held in Siegel II that "there is no evidence in the record that the [trial] court ever issued a sequestration order[,]" but denied the claim after it assumed, *arguendo*, that it there was one. (ECF No. 18-8 at 5).

**(b)    Legal Analysis**

The Superior Court in <u>Siegel II</u> applied the <u>Strickland</u> standard when it denied Claim 2 on the merits. (ECF No. 18-8 at 3-4).[12] Therefore, its adjudication withstands review under § 2254(d)(1)'s "contrary to clause. " To satisfy his burden under § 2254(d)(1)'s "unreasonable application" clause, Petitioner must do more than convince this Court that the Superior Court's adjudication was incorrect. <u>Dennis</u>, 834 F.3d at 281. He must show that it "'was *objectively* unreasonable.'" <u>Id.</u> (quoting <u>Williams</u>, 529 U.S. at 409) (emphasis added by court of appeals).

In rejecting this claim, the Superior Court held that the decision to permit the Commonwealth to recall Zierenberg was a discretionary one for the trial court to make and that, even if Attorney Sloane had objected, the trial court would have overruled the objection and would have "allow[ed] the jury to weigh the voice identification testimony[.]" (ECF No. 18-8 at 5). This Court cannot conclude that the Superior Court's determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement[,]" <u>Richter</u>, 562 U.S. at 103, and therefore, its adjudication withstands review under § 2254(d)(1)'s "unreasonable application of" clause. Recognizing that she likely would not succeed in keeping the prosecution from recalling Zierenberg, Attorney Sloane did undercut the value of his identification by making the point, during her cross-examination of him, that his in-court identification was unreliable because he knew it was Petitioner's voice he was hearing when he was listening to the recording. (Trial Tr., 3/20/12, at 101-02). In her closing argument, Attorney Sloane urged the jurors not to credit Zierenberg's in-court identification for that reason and asked them to use their "common sense" and conclude that the in-court

---

[12]    Pennsylvania courts typically articulate <u>Strickland</u>'s standard in three parts, as the Superior Court did in <u>Siegel II</u>, while federal courts set it out in two. The legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts. <u>See</u>, <u>e.g.</u>, <u>Commonwealth v. Mitchell</u>, 105 A.3d 1257, 1266 (Pa. 2014); <u>Commonwealth v. Sepulveda</u>, 55 A.3d 1108, 1117-18 (Pa. 2012); <u>Commonwealth v. Kimball</u>, 724 A.2d 326, 330-33 (Pa. 1999).

identification should be given no weight. (Id. at 118). Her argument on the point was a strong one, and it is worth noting that the prosecutor did not mention Zierenberg's in-court identification in his closing argument. (Id. at 127-39).

This Court must next consider whether Petitioner has met his burden of showing that the Superior Court's adjudication of Claim 2 "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). He has not. To the extent that the Superior Court made any factual determination that precluded relief on Claim 2, those findings had the necessary evidence in the state court record to survive review under § 2254(d)(2).

Based upon all of the foregoing, Claim 2 is denied. Alternatively, even if this Court were to conclude that Petitioner satisfied his burden under § 2254(d) and it reviewed Claim 2 *de novo*, it would still deny relief. As already mentioned, Attorney Sloane provided the jury with convincing grounds not to credit Zierenberg's in-court identification and the prosecutor did not mention that identification in his closing argument. Additionally, when Zierenberg testified on the first day of the trial, he gave a physical description of the man that committed the August 2008 robbery that matched Petitioner's description and not Dimon's. The testimony Zierenberg gave that day, when coupled with Thompson's description of the man who committed the robbery the night he was working, supported the prosecution's theory that Dimon carried out the July 2008 robbery and Petitioner carried out August 2008 robbery, during which he shot Zierenberg. For these reasons, Petitioner has not demonstrated that, but for Attorney Sloane's alleged deficient performance, there is a reasonable probability that the result of his trial would have been different. Strickland, 466 U.S. at 694.

Based upon all of the foregoing, Claim 2 is denied on the merits.

### 2. Claim 3: Failure to Object to the Sentence Imposed

#### (a) Relevant Background

Judge Dunlavey sentenced Petitioner to a term of 18-40 years of imprisonment on the attempted murder count, to be served consecutive to an unrelated sentence previously imposed upon Petitioner. (SCR No. 17). The judge ordered that that sentence be followed by a consecutive sentence of 5-10 years of imprisonment on the robbery count, to be served concurrent with a sentence of 5-10 years for criminal conspiracy. (Id.) Thus, the total aggregate sentence Judge Dunlavey imposed was 23-50 years of imprisonment.

In Claim 3, Petitioner contends that his trial counsel was ineffective for failing to object to the sentence imposed. (ECF No. 1 at 10). According to Petitioner, this is the same claim that he raised to the Superior Court in his first PCRA appeal (id. at 11), which that court denied in Siegel II. Before that court, Petitioner contended that Attorney Sloane should have objected on the grounds that Judge Dunlavey had initially stated during the hearing that he would sentence Petitioner to a term of 12-24 years on the attempted murder count, but then substantially increased that term after the prosecutor argued that Petitioner "deserves much more time." (ECF No. 18-2 at 22; Sent. Hr'g Tr., 5/1/12, at 24).

In denying this claim in Siegel II, the Superior Court held that Attorney Sloane was not ineffective because there was no merit to Petitioner's underlying claim that Judge Dunlavey erred in the manner in which he sentenced Petitioner. (ECF No. 18-8 at 7-8). It explained that, "[c]ontrary to [Petitioner's] claim, the trial court provided ample reasoning for its sentences, which were all within the guidelines." (Id. at 7). It then provided a lengthy quotation from the sentencing transcript and concluded that Judge Dunlavey "clearly stated [his]reasons for the sentences, and because the sentences themselves are reasonable under the circumstances, this claim is meritless." (Id. at 7-8).

#### (b) Legal Analysis

The Superior Court's adjudication of Claim 3 survives review under § 2254(d). Because it applied the Strickland standard when it evaluated this claim, (ECF No. 18-8 at 3-4), its adjudication was not "contrary to" the controlling Supreme Court law. As for the other inquiries this Court must conduct, Petitioner has not satisfied his burden under §2254(d)(1)'s "unreasonable application of" clause or § 2254(d)(2)'s provision pertaining to the facts.

Judge Dunlavey set forth the reasons why he initially intended to sentenced Petitioner to a term of 12-24 years on the attempted murder count. (Sent. Hr'g Tr., 5/1/12, at 19-22). The prosecutor persuaded him that Petitioner "deserve[d] much more time." (Id. at 24). After considering the matter further, the judge set forth why he agreed that Petitioner deserved to serve a lengthier sentence on the attempted murder count, which he then imposed. (Id. at 25-26). There is no basis for this Court to conclude that the Superior Court's adjudication of Claim 3 was either an "unreasonable application of" Strickland or an unreasonable determination of the facts.

Based upon all of the foregoing, Claim 3 is denied on the merits.

### 3. Claim 4: Failure to Introduce Zierenberg's October 9, 2008, Statement

#### (a) Relevant Background

In Claim 4, Petitioner contends that Attorney Sloane was ineffective for failing to introduce the October 9, 2008, statement Zierenberg gave to the police in order to impeach his testimony. (ECF No. 1 at 12). Petitioner raised this claim in the first *pro se* PCRA petition (ECF No. 22-1 at 17-18), but his court-appointed counsel, Attorney Konzel, did not litigate it because she thought it had no merit, explaining: "This counsel believes that trial counsel deliberately stayed away from attacking the victim in this case as it would have done more harm than good due to the severe injury the victim received from the incident." (ECF No. 18-2 at 14). Respondents argue that because Petitioner did not present Claim 4 to the Superior Court, he procedurally defaulted it and this Court cannot review it on the merits. (ECF

27

No. 18 at 4-5). In his reply, Petitioner contends that he can overcome the default of this claim under Martinez v. Ryan, 566 U.S. 1 (2012) because Attorney Konzel was ineffective for failing to litigate it. Since it is more efficient for this Court to simply dispose of Claim 4 on the merits and avoid the more complex issue of whether it is procedurally defaulted, this Court will proceed in that manner.

(b)    **Legal Analysis**

Petitioner argues that if Attorney Sloane had introduced Zierenberg's October 9, 2008, statement, she could have impeached his testimony by showing that he "could not remember what happened" the night of the robbery and shooting. (ECF No. 1 at 12). In support of this claim, he attached to his reply a copy of Trooper O'Neill's October 16, 2008, police report, which contains notes about his October 9, 2008, interview of Zierenberg, which he recorded with Zierenberg's permission. (ECF No. 22-4 at 2). The police report indicates that during the interview, Zierenberg told Trooper O'Neill that "[a]t first" he thought that the assailant shot him once and that it was not until he "got further information from the hospital" that he learned the assailant actually shot him twice. (Id.) At Petitioner's trial, Zierenberg testified that Petitioner shot him twice. (Trial Tr., 3/19/12, at 79-80).

This Court must begin its analysis of Claim 4 with the "strong presumption that [Attorney Sloane's] conduct fell within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, and it is Petitioner's burden to prove that her performance was objectively unreasonable. Under the circumstances presented here, Petitioner has not met his burden. This Court is "required not simply to give [Attorney Sloane] the benefit of the doubt, but to affirmatively entertain the range of possible reasons [she] may have had for proceeding as [she] did." Cullen v. Pinholster, 563 U.S. 170, 196 (2011) (internal quotations and citations omitted). See also Richter, 562 U.S. at 110 ("Strickland…calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.") It may be that Attorney Sloane avoided cross-examining Zierenberg about the details of the

28

shooting, including whether he initially realized how many times he had been shot, because that line of inquiry would focus too much attention on the senseless and horrific nature of the shooting.

Moreover, that Zierenberg may have been confused "[a]t first," and not have realized until he "got further information from the hospital" (ECF No. 22-4 at 2), about how many times he may have been shot was understandable under the circumstances, given the shock he would have been under after sustaining a gun-shot wound to his head.[13] The impeachment value of Zierenberg's statement to Trooper O'Neill also would have been undercut by Zierenberg's acknowledgement that it took time for him to remember what occurred during the robbery, and that he had no recollection of the incident until he began to recover from his injuries. (Id. at 81-82).

For all of these reasons, reasonable counsel may have concluded that the harm that might result by exploring the topic with Zierenberg outweighed whatever benefit could have been gained by attempting to impeach him with information that, at first, he was confused about whether he had been shot once or twice in the head. Therefore, Petitioner has not met his burden of establishing Strickland's first prong: that Attorney Sloane's complained-of conduct was objectively unreasonable. He also has not demonstrated that, but for Attorney Sloane's complained-of conduct, there is a reasonable probability that the outcome of either his trial or his sentencing hearing would have been different. Therefore, Petitioner has not met his burden of establishing Strickland's prejudice prong.

Based upon all of the foregoing, Claim 4 is denied.

### C.     Motion to Amend

---

[13]     Kaitlyn Weber, who was the customer who entered Urraro Oil just after the August 2008 robbery, testified at Petitioner's trial that when she walked onto the scene, Zierenberg was standing behind the cash register with "blood all over him and blood on the wall behind him and he was just, you know, mumbling things." (Trial Tr., 3/19/12, at 72). She said he was "in complete shock." (Id. at 73).

Rule 2(c) of the Rules Governing Section 2254 Cases In the United States District Courts provides that in a state prisoner's petition for a writ of habeas corpus, he or she "must: (1) specify all the grounds for relief available to the petitioners; [and] (2) state the facts supporting each ground[.]" Petitioner used the standard form for 2254 petitions when he filed his petition, and it warned him that "if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date." (ECF No. 1 at 7). That warning is given because of the significant procedural limitations imposed by AEDPA, including its one-year statute of limitations, which is calculated on a claim-by-claim basis. Fielder v. Varner, 379 F.3d 113, 118-22 (3d Cir. 2004).

When Petitioner filed his petition with this Court in December 2015, he raised only the four grounds for relief discussed above. In March 2018, after this Court had directed Respondents to expand the record to include the transcripts of Dimon's plea and sentencing hearings, Petitioner filed a motion in which he sought leave to amend his petition to include a claim that Judge Dunlavey was biased in violation of his due process right to a fair tribunal. (ECF No. 25 at 4). This new claim was premised upon Judge Dunlavey's statement at Dimon's January 10, 2012, sentencing hearing that he had "a real problem with [Petitioner]. I want justice done[.]" (ECF No. 24-2 at 11).

The availability of the option of amending a petition depends in part on the stage of the case at which a petitioner seeks to amend. In this case, Petitioner moved to amend his petition to raise a claim of judicial bias well after Respondents filed their answer and, as a result, he may amend his petition only with Respondents' consent, which he does not have, or leave of court. Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." Id. Leave to amend a pleading may be denied where the court finds: (1) undue delay; (2) undue prejudice to the non-moving party; (3) bad faith or dilatory motive; or (4) futility of amendment. See, e.g., Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000).

The undue delay factor is present here, since Dimon's January 10, 2012, sentencing transcript has always been available to Petitioner, and he could have obtained a copy of it before his March 2012 trial even commenced. If he had, he could have filed a motion requesting that Judge Dunlavey recuse himself if he truly believed there were grounds to support such a motion. Petitioner also could have requested that the state court or his counsel provide him with a copy of the January 10, 2012, transcript during his trial, direct appeal, or PCRA proceedings. If he had, he could have then exhausted his judicial bias claim in the state court so that it would have had the opportunity to adjudicate it in the first instance. If he had followed that course and the state court denied his judicial bias claim on the merits, he could have raised it in his timely-filed December 2015 petition and this Court's analysis of it would be subject to AEDPA's deferential standards of review at § 2254(d) and (e)(1). Petitioner should not be permitted to avoid those standards of review by advancing a judicial bias claim that is premised upon a transcript that has always been available to him.

The futility of amendment factor is also present here, since Petitioner's judicial bias claim is untimely under AEDPA's statute of limitations unless it relates back to the date of his timely-filed December 2015 petition.[14] Rule 15(c)(1) provides, in relevant part, that "[a]n amendment to a pleading relates back to the date of the original pleading when:…(B) the amendment asserts a claim…that arose out of the conduct, transaction, or occurrence set out–or attempted to be set out–in the original pleading[.]"

---

[14]     As explained in note 2, the claims that Petitioner raised in his petition were timely filed under AEDPA's one-year statute of limitations, which for this case ran from the date his judgment of sentence became final. 28 U.S.C. § 2244(d)(1)(A). Another provision of the statute of limitations set forth at § 2244(d)(1)(D) does commence the one-year limitations period on "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." That provision does not apply here because the transcript of Dimon's January 10, 2012, sentencing hearing is a document Petitioner could have obtained during his state-court proceedings.

"In <u>Mayle v. Felix</u>, 545 U.S. 644 (2005), the Supreme Court addressed how this relation back rule applies in the context of a habeas petition." <u>Wilkerson v. Superintendent Fayette SCI</u>, 871 F.3d 221, 237 (3d Cir. 2017). It held that "[a]n amended habeas petition…does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." <u>Mayle</u>, 545 U.S. at 648. The Supreme Court rejected the decisions of those courts of appeals which "allow relation back of a claim first asserted in an amended petition, so long as the new claim stems from the habeas petitioner's trial, conviction, or sentence." <u>Id.</u> at 656. "Under that comprehensive definition," the Supreme Court explained, "virtually any new claim introduced in an amended petition will relate back, for federal habeas claims, by their very nature, challenge the constitutionality of a conviction or sentence, and commonly attack proceedings anterior thereto." <u>Id.</u> at 656-57. Rule 15's relation back provision, the Supreme Court further explained, "relaxes, but does not obliterate, the statute of limitations; hence *relation back depends on the existence of a common core of operative facts uniting the original and newly asserted claims*." <u>Id.</u> at 659 (internal quotations and citation omitted) (emphasis added). It held that "[s]o long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order." <u>Id.</u> at 664. <u>See also</u> <u>Wilkerson</u>, 871 F.3d at 237 ("The [Supreme Court in <u>Mayle</u>] elaborated that two claims merely arising from the same 'conviction or sentence' cannot be enough to satisfy the relation back standard and that, in order to properly relate to one another, the claims in the amendment and the claims in the original petition must be 'tied to a common core of operative facts.'")

The operative fact underlying the judicial bias claim Petitioner seeks to raise is the comment made by Judge Dunlavey at Dimon's first sentencing hearing held on January 10, 2012. That is not related to the operative fact underlying his <u>Brady</u> claims, which is that there was an alleged undisclosed

agreement between Dimon and the Commonwealth, or to the operative facts underlying his ineffective-assistance claims, which are premised upon Attorney Sloane's failure to object to Zierenberg's in-court identification and to the sentence imposed, and also her failure to attempt to impeach Zierenberg with his October 9, 2008, statement to Trooper O'Neill. Therefore, Petitioner's judicial bias claim is distinct from the claims he raised in the petition and it does not relate back to the date the petition was filed. Because the claim is timebarred, it would be futile to grant him leave to amend his petition and raise it.

Based upon all of the foregoing, Petitioner's motion to amend (ECF No. 25) is denied because of undue delay and futility.

## IV.     Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from…the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]" 28 U.S.C. § 2253(c)(1)(A). It also provides that "[a] certificate of appealability may issue...only if the applicant has made a substantial showing of the denial of a constitutional right." Id. § 2253(c)(2). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Where the district court has rejected a constitutional claim on its merits, "[t]he

petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id. Applying those standards here, jurists of reason would not find it debatable whether each of Petitioner's claims should be denied for the reasons given herein. Accordingly, the Court will not issue a certificate of appealability on any of Petitioner's grounds for relief.

An appropriate Order follows.

**ORDER**

AND NOW, this 4th day of March, 2019, IT IS ORDERED that Petitioner's claims for habeas relief are denied, a certificate of appealability is denied on all claims, and his motion to amend (ECF No. 25) is denied.

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States District Judge

Dated:  March 4, 2019